UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

CHRISTOPHER ADAMS, BRUCE SMILEY )
WARREN DAVIS, JAMES SPANN, GARY )
SEELEY, CHAD BELL, ROY ROGERS, )
JOHN SAULSBERRY, JOSEPH OVERMAN, )
RICHARD CALFEE, RONALD HAYES, )
BARRY WADDELL, CARLOS AGUILAR, )
and ALL CURRENT and FUTURE )
SIMILARLY SITUATED TENNESSEE )
DEPARTMENT OF CORRECTION INMATES, )
CORRECTIONAL OFFICIALS,VISTORS, )
and VOLUNTEERS, )
    Plaintiff's/Representative's, )
)
v. )
)
TENNESSEE DEPARTMENT OF )
CORRECTION COMMISSIONER TONY )
PARKER and ASSISTANT COMMISSIONER )
OF PRISONS LEE DODSON (sued in )
official capacity only), )
    Defendant's. )

HSM/SKL

Case No.: 1:19-cv-296

§1983 CLASS ACTION

WITH JURY DEMAND ~~FILED~~

OCT 25 2019

Clerk, U. S. District Court
Eastern District of Tennessee
At Chattanooga

---

VERIFIED CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
WITH JURY DEMAND

---

## INTRODUCTION

This is a 42 *United States Code* §1983 complaint brought by the above-captioned Plaintiff's/Representatives and all similarly situated, current and future, Tennessee Department of Correction ("TDOC") inmates, correctional officials, volunteers, and visitors (hereafter collectively the "Plaintiff's", "Representative's", and/or "inmates" where appropriate) seeking injunctive and declaratory relief.

The complaint alleges that TDOC Commissioner Tony Parker ("Parker") and TDOC Assistant Commissioner of Prisons Lee Dodson("Dodson") have created, promulgated, and are enforcing a policy that requires all inmates housed in the general population of TDOC and privately managed facilities to wear permanently attached colored wristbands. As a result thereof, the Plaintiff's are experiencing symptoms that are identifiable as

*1*

being related to foodborne illnesses, and they continue to be in imminent danger of contracting serious foodborne illnesses which may lead to sickness and/or death. Inmates working in the food services department at each respective prison that houses Tennessee prisoner's wear the mandatory wristbands while handling, preparing, and serving food, which is in direct violation of sound sanitary procedures for same, and state law. Inmates handle and prepare their own food, and food with their visitor's while wearing the unsanitary wristbands also.

Inmates have a Constitutional right protected by the Eigth Amendment of the United States Constitution to have their food handled, prepared, and served in a manner that is consistent with sound sanitary procedures.

Plaintiff's are also in imminent danger of contracting bacterial and viral infections such as hepatitis A, B, and C, E-coli, and other pathonegenic infections that may be cultured within the multiple layers of the wristbands thereby resulting in serious illness, disease, and/or death as a result thereof.

Inmates wear the wristbands 24 hours a day, 7 days a week, indefinitely until they wear out, break, or are changed for another reason — some have currently been attached to some inmates since the inception of same around November of 2015. Inmates wear the wristbands during the course of all of the activities and conditions that they encounter throughout each day. As such, the wristbands are the equivalent of a petri-dish used to culture microorganism's/pathogen's.

The common areas and items therein shared by inmates, correctional officials, volunteers, and visitors at each respective prison are contaminated by the wristbands and are therefore breeding grounds for the microorganism's/pathogen's spread thereto by each wristband that comes in contact with same.

Some inmates are required to wear the wristbands while working on, around, or near

2

machinery, heavy equipment, and electrically charged circuits and components thereby placing them in imminent danger of being maimed and/or electrocuted if the wristband is snagged by a moving part, or an electrically charged component of a machine, which may also result in death.

Parker and Dodson have promulgated policies that command for staff and inmates working in food services to comply with "the most current Food Service Establishment Regulations that are promulgated by the Tennessee Department of Health ("TDOH")." The TDOH's regulations prohibit food preparers from wearing anything other than a plain wedding band on their hands and arms while preparing food. The regulations promulgated by the TDOH are what Tennessean's consider to be the decent standards of a civilized society and to subject inmates to conditions contrary to such amounts to cruel and unusual punishment. Accordingly, Parker's and Dodson's knowledge of the TDOH regulations that they have commanded compliance with in some policies, and then totally disregarded in relation to the wristband policy, shows that they have acted with deliberate indifference to the Plaintiff's health and safety. Parker and Dodson have both received notice of the concerns in relation hereto on more than one occasion and have chosen to not take any remedial action with regards to the clearly unhealthy and dangerous wristbands, which pose an imminent hazard to the health and safety of Plaintiff's. It is axiomatic that it is unsafe to wear rings, watches, wristbands, and loose fitting clothing while working on machinery/equipment with moving parts, or, while working on energized electrical circuits. As reasonable officials, Parker and Dodson were aware of the dangers, and if not, once notified, they still did not correct the problem.

The unhealthy and unsafe conditions of confinement as set forth herein amount to cruel and unusual punishment that is contrary to the decent standards of a civilized society in violation of the Eighth Amendment which is applicable to Tennessee through the Fourteenth Amendment.

## JURISDICTION

1. The Court has jurisdiction over Plaintiff's claims of violation of federal constitutional rights pursuant to 28 *United States Code* §§ 1331 and 1343.

## VENUE

2. Venue is proper in this Court pursuant to 28 *United States Code* §1391 (b)(2), because a substantial part of the events and/or omissions giving rise to the claims alleged herein occurred and/or are occurring at the Bledsoe County Correctional Complex ("BCCX").

3. The BCCX is a TDOC facility where the Representative Plaintiff's are incarcerated located in Pikeville, Tennessee.

4. Parker and Dodson conduct business at the BCCX and are ultimately responsible for Constitutional compliance thereat in relation to their policies.

5. Parker and Dodson are responsible for the health and safety of inmates incarcerated at the BCCX who are ultimately in their custody.

6. The potential BCCX correctional employee and inmate witnesses with personal knowledge of the events giving rise to this action and the conditions in relation thereto as alleged herein, live at or in close proximity to the BCCX and are therefore in close proximity to Chattanooga, Tennessee.

7. Based on information and belief, some of the BCCX correctional employees will be unwilling witnesses that will require subpoena's for their attendance at trial, a hearing, or deposition. As such, the BCCX is within 100 miles of the United States District Court for the Eastern District of Tennessee at Chattanooga.

8. The BCCX's Sanitation Officer and Facility Safety Officer both conduct monthly inspection's of the prison's food service, working, living, and other general areas. They both complete report's in relation thereto which are in the custody and control of the BCCX Warden.

9. The BCCX Institutional Job Coordinator maintains documents detailing the jobs

4

available at the BCCX, which are typical at all prison's that house Tennessee prisoner's. The description of these jobs and the requirements / duties that must be performed in relation to each job are detailed in documents located at the BCCX in the Warden thereof's custody and control.

10. The BCCX maintains current and up to date TDOC policies that relate to the events described herein, as well as other relevant documents.

## PARTIES

11. Christopher Adams ("Adams"), Bruce Smiley ("Smiley"), Warren Davis ("Davis"), James Spann ("Spann"), Gary Seeley ("Seeley"), Chad Bell ("Bell"), Roy Rogers ("Rogers"), John Saulsberry ("Saulsberry"), Joseph Overman ("Overman"), Richard Calfee ("Calfee"), Ronald Hayes ("Hayes"), Barry Waddell ("Waddell"), and Carlos Aguilar ("Aguilar"), are the Representative Plaintiff's in this class action who were, and are, incarcerated at the BCCX during the events alleged and described herein.

12. Unamed class member Plaintiff's are comprised of all other similarly situated current TDOC inmates, correctional officials, volunteers, and visitors of TDOC and privately managed facilities.

13. Unamed class member Plaintiff's are comprised of all similarly situated future TDOC inmates, correctional officials, volunteers, and visitors of TDOC and privately managed facilities since the class thereof is "fluid"— that is, the class is constantly changing and evolving.

14. Defendant Tony Parker is the TDOC Commissioner, which is the head of the TDOC, and he is responsible for the promulgation and enforcement of the relevant policies affecting the Plaintiff's at the BCCX and throughout the state, and he is responsible for the health and safety of the inmates in his charge, and, those who frequent TDOC facilities. He is sued in his official capacity.

15. Defendant Lee Dodson is the TDOC Assistant Commissioner of Prisons responsible for assisting in the promulgation and enforcement of TDOC policies, ensuring inmates' health and

5

safety, and approves or denies the type of wristbands that are allowed to be placed on inmates. He is sued in his official capacity.

16. Defendant's Tony Parker and Lee Dodson have acted, and continue to act, under color of state law at all times relevant to this complaint.

## FACTS

CLASS ACTION ALLEGATIONS.

17. The Court may certify the case *sub judice* as a class action pursuant to *Federal Rules of Civil Procedure* 23 upon a finding that the prerequisites thereof are met.

CLASS DEFINITION.

18. All similarly situated persons, current and future, who are committed to the custody of the Tennessee Department of Correction for incarceration under its control and supervision, housed in public and privately owned and managed facilities, as well as correctional employees, volunteers who work thereat, and visitors to said facilities, for whom the Tennessee Department of Correction has the ultimate responsibility for their health, safety, and well being while incarcerated therein, or, while on each respective prison's property in relation to the food consumed thereat which is handled, prepared, and served by inmates wearing wristbands, those who physically interact with inmates wearing wristbands, and those who share common areas of each respective prison with inmates wearing wristbands; as well as inmate class member's who are required to operate machinery/equipment with moving parts, or, work on electrically energized circuits and/or components while wearing a wristband.

NUMEROSITY AND OTHER RELEVANT FACTORS.

19. On March 31, 2019, the current published consensus of the TDOC listed 21,871 inmates in the TDOC's custody, control, and supervision that are housed in TDOC and privately managed facilities.

20. It is axiomatic that the TDOC and privately managed facilities that house the 21,871

6

inmates in the TDOC's custody have several thousand correctional officials, volunteers, and visitors who frequent each respective prison throughout the state and interact with inmates wearing wristbands. [The number and/or an estimate thereof can be determined through discovery if necessary.]

21. The joinder of all TDOC inmates, correctional officials, volunteers, and visitors who frequent prison's housing TDOC inmates is impracticable.

22. The geographical diversity of the class members are scattered throughout the State of Tennessee at multiple different prison's in different counties and possibly different states.

23. The individual class members would not likely be able to bring separate lawsuits; and the vast majority do not even know that they have a claim at this time and that they are in imminent danger of contracting serious foodborne illnesses, other illnesses, and diseases which may lead to death.

24. The inmate Representative's have limited access to legal representation, experts in food safety, epidimiology, and work safety to ensure that the imminent danger that the class is currently being subjected to receives appropriate attention.

25. The Representative's do not have a formal legal education.

26. There are some class members who do not have their *General Equivalency Diploma* and some who are illiterate.

27. The majority of the inmate class members are indigent and are unable to afford competent and adequate representation to pursue individual claims.

28. There are hispanic inmates in the TDOC's custody who speak little if any English thereby making it difficult, if not impossible, for them to understand the claims, and there may be others who are only fluent in other languages.

29. The complaint seeks class-wide injunctive relief that will affect any person,

7

inmate or otherwise, who has any dealings with TDOC inmates as described herein.

30. Class certification will save judicial resources by avoiding a multitude of individual lawsuits in the Eastern, Middle, and Western District Courts of Tennessee once news of the claims described herein are made known.

31. Class action status is needed to prevent the claims from becoming moot in the event that the Representative's expire their sentences, or are released on parole before the case can be litigated to completion, and, to ensure that the class members' health, safety, and well-being is protected.

COMMONALITY.

32. All inmate class members in the custody of the TDOC are subject to the same statutes, regulations, and policies.

33. All inmate class members in the custody of the TDOC may potentially be housed at any TDOC or privately managed facility in the general population during their term of incarceration.

34. All class members eat, or may eat if they so choose, food handled, prepared, and served by inmates wearing wristbands.

35. All class members eat, or may eat if they so choose, food prepared in, on, and/or with equipment, pots, pans, utensils, tables, and etcetera that inmate wristbands come in contact with.

36. All class members are subject to scratches, scrapes, or cuts by the wristbands.

37. The determination of whether the wristbands are, or are not sanitary and safe, and whether they do, or do not pose a risk to the current and future health of the class members in, or not in violation of the Eighth Amendment of the United States Constitution as alleged herein is a class-wide issue that is capable of generating common answers that will resolve the litigation in relation thereto.

8

38. The issuance of a declaration and final injunction declaring TDOC Policy 506.13, Identification of Inmates section VI(E) as conducive to create unsanitary and unsafe conditions of confinement in violation of the Eighth Amendment, and the enjoining of Parker and Dodson by final injunction ordering the permanent removal and discontinuance of the wristbands that are permanently attached to inmates will resolve the class-wide claim.

TYPICALITY.

39. The Representative's claims are identical to the claims of the class because all claims involve the constitutionality of TDOC Policy 506.13, Identification of Inmates section VI(E) regarding the sanitation and safety of the wristbands, and if the Representative's succeed in obtaining declaratory and injunctive relief for themselves, the claims of all of the class members will succeed and all members of the class will benefit from the relief.

40. TDOC Policy 506.13, Identification of Inmates section VI(E) is a state-wide policy that affects all class members.

ADEQUACY.

41. The Representative's are part of the class, possess the same interests, currently suffer, and/or, are in imminent danger of contracting food borne illnesses, bacterial infections, viral infections, fungal infections, and parasitic infections.

42. The Representative's will rigorously prosecute the interests of the class through qualified counsel as they have a primordial instinct based in self-preservation to avoid, up to and including but not limited to, foodborne illnesses, communicable diseases, bacterial infections, and viruses which may lead to serious illness and/or death; as well as the prevention of being maimed, electrocuted, or killed by unsafe working conditions.

RULE 23(b)(1)(A), INCONSISTENT AND VARYING ADJUDICATIONS.

43. The TDOC has inmates incarcerated in, and correctional employees, volunteers, and visitors who frequent facilities where TDOC inmates are incarcerated, in Tennessee's

9

Eastern, Middle, and Western District Court jurisdictions thereby creating a risk of inconsistent and varying adjudications if separate actions are brought by individual class members that could establish incompatible standards of conduct for Parker and Dodson.

44. If different courts in Tennessee rule separately on the constitutionality of TDOC Policy 506.13, Identification of Inmates section VI(E), Parker and Dodson could be subject to inconsistent judgments that would create unmanageable and conflicting standards within the State of Tennessee, thereby trapping Parker and Dodson into a position where they cannot comply with one judgment without violating the terms of another.

45. Based on information and belief, the TDOC has had more than 17 grievances filed in relation to the wristbands required by TDOC Policy 506.13, Identification of Inmates section VI(E).

## RULE 23 (b)(2), REFUSAL TO ACT, FINAL DECLARATORY AND INJUNCTIVE RELIEF.

46. Parker and Dodson have refused to take remedial action to correct TDOC Policy 506.13, Identification of Inmates section VI(E) in relation to the unsanitary and unsafe conditions of the wristbands by adopting and implementing the color-code scheme into the Inmate Identification ("ID") cards that each inmate has and is required to carry on their person as suggested by the Representative's for a sanitary and safe alternative remedy for the TDOC's security concerns, therefore, declaratory and injunctive relief will be required to remedy the ongoing Constitutional violation which would apply to the class as a whole.

## RULE 23 (c)(2)(A), DISCRETIONARY NOTICE.

47. Notice, or the manner thereof, in relation to a class action lawsuit lies in the discretion of the trial court.

48. The TDOC has bulletin boards in each housing unit that inmates are assigned to for posting policy change notices, as well as critical and general information thereby

providing an adequate means of notice of this lawsuit to the inmate class members if the Court so desires.

49. Each inmate in the TDOC's custody is assigned to the caseload of a Correctional Counselor.

50. Correctional Counselors are required to have contact with each individual inmate on their caseload at least one time per month and to document same on the Tennessee Offender Management Information System ("TOMIS") thereby offering a redundant and/or alternative means to provide notice of this lawsuit to the class inmates if the Court so desires.

51. Notice of this lawsuit can be ordered to be be posted at the entrance of each respective prison that houses TDOC inmates to ensure that correctional officials, volunteers, and visitors who frequent the prison's are on notice of this lawsuit if the Court so desires.

UNCONSTITUTIONAL POLICY.

52. On October 15, 2018, Parker and Dodson promulgated and began enforcement of TDOC Policy 506.13, Identification of Inmates section VI(E) ( hereafter collectively the "regulation"). [All of the exhibit's ("Ex.") hereafter referred to in the "appendix", Doc. __?__ - 1 attached hereto, are numbered in chronological order from beginning to end for ease of location. See, Ex. 1 p. 8; also available at: < htts://www.tn.gov/assets/entities/correction/attachments/506-13.pdf > ]

53. Based on information and belief, Dodson is part of a committee and/or group that creates, promulgates, and then enforces TDOC policies, up to and including but not limited to, through the TDOC's grievance procedures.

54. Dodson is the third and final level of the TDOC's grievance procedure and his decisions are not further appealable.

55. As the Commissioner of the TDOC Parker must approve all TDOC policies and/or changes thereto.

56. Parker participates in the creation of TDOC policies.

11

57. The regulation makes it mandatory for all inmates in the general population of TDOC and privately managed facilities to wear color-coded wristbands. [Ex. 1 p. 8 at E]

58. The wristbands are attached to inmates' wrists "with metal dual-grip fasteners" and are being "utilized to enhance security measures of inmates attempting to enter unauthorized areas of the facility, such as housing units which the inmates are not assigned." [Id at E and E (5)]

59. The BCCX Site 2 where the Representative's are incarcerated has 14 general population housing units.

60. Inmate wristbands are color-coded based on their housing unit assignment with no color-coded pattern being repeated. [Id at (2)]

61. There is a placard above each housing units door with the appropriate matching color-code of the inmates' wristbands assigned thereto. [Id at (3)]

62. Correctional Officers ("C/O") have a responsibility "to examine each inmate's wristband to ensure the inmate is entering the proper unit/area." [Id at (4)]

63. Parker and Dodson put forethought into the health and safety of inmates in the promulgation of the regulation, and Dodson must approve the type of wristband that is placed on inmates' wrists. [Id at (5)]

64. Based on information and belief, Dodson approved the multi-layered wristbands worn by the inmates at the BCCX.

65. The wristbands are permanently attached and cannot be removed without cutting, tearing, or breaking them off. [Id at (5)]

66. Inmates who tamper with or alter their wristband will "immediately" have a new wristband applied and "be assessed a $15.00 replacement fee in addition to [a] $4.00 Class B disciplinary fine" if convicted of "destruction of state property" for the tampering or altering thereof. [Id at (6)]

12

67. Inmates that refuse to wear the wristband are to be segregated and charged with defiance. [Id at (7)]

68. Defiance is a serious misconduct charge that can be either a Class A or B disciplinary infraction. [Ex. 2 p. 14 # 14, TDOC Policy 502.05, Definitions of Disciplinary Offenses; also available at: < htts://www.tn.gov/assets/entities/correction/attachments/502-05.pdf > ]

69. Inmates convicted of a Class A or B disciplinary infraction are subjected to punitive segregation, a higher security classification, loss of sentence reduction credits resulting in a longer period of incarceration, loss of privileges, a fine, and they receive a permanent negative mark on their disciplinary history/institutional record.

70. Disciplinaries may affect parole and clemency prospects.

READY ALTERNATIVE.

71. The TDOC operated since its inception up until October, 15, 2018 without the wristbands.

72. For more than 25 years, inmates have been "issued a laminated Inmate Identification Card [("Id")], CR-2118, and advised of the requirement to keep it on their person at all times." [Ex. 1 p. 7 D]

73. Inmate ID's have their photograph on one side and their name, number, date of birth, heigth, weight, date issued, and signature on the other side, and, they are printed in color. [Id at D(1); see example ID at p.9]

74. The cost of a ID is $5.00, whereas the wristband is $15.00. [compare Id at p. 7 (3) to p.8 (6)]

75. Inmates at the BCCX are required to wear their ID attached to their shirt and visible for staff to see any time that they leave their respective housing unit.

76. Each BCCX housing units C/O maintains a roster that details the name, number, cell, and bed assignment of each inmate that is assigned to same.

77. Each time that an inmate leaves or returns to his assigned housing unit he is required

to inform the C/O of his cell number and bed assignment. The C/O records the inmates' departure and return time, along with his destination on the housing unit's roster.

78. The color-code scheme that is being used on the wristbands could readily and easily be incorporated into the bottom of the inmate ID's by shifting the name, number, etc. up just a little.

79. Placing the color-code scheme on the ID's is more sanitary, and safer in relation to operating machinery /equipment and working on electrical circuits.

80. The incorporation of the color-code scheme on the $5.00 ID's would save taxpayer's the cost of the wristbands.

81. The housing units at the BCCX are the only areas with like color-code requirements for access thereto.

82. Inmates from each of the 14 units that make up the BCCX's general population work in all of the different areas of the prison together with inmates wearing different colored wristbands.

83. On December 22, 2017, BCCX Associate Warden of Security Bert Boyd ("Boyd") (former) issued a memorandum instituting an ID card count. [Ex. 1 p. 10]

84. Boyd's ID card count procedure is still in effect as of the filing of this lawsuit.

85. Boyd's ID card count procedure requires that "[I]nmates in the housing unit will stand at the cell door and present their inmate identification card to the counting staff name and number side first and then turn the card around to the picture side for verification of identification and proper cell assignment according to the unit roster." [Id]

UNSANITARY CONDITIONS OF WRISTBANDS; BIOLOGICAL HAZARDS; CONTAMINATION/CROSS-CONTAMINATION.

86. On November 26, 2018, Boyd issued a memorandum relating to the implementation of the wristbands and same were permanently attached to the right arm of all BccX general population inmates shortly thereafter. [Ex. 1 p. 11]

14

87. Based on information and belief, all inmate class members' wristbands are exposed to like and/or similar conditions throughout the state where TDOC inmates are housed.

88. The wristbands are permanently attached to inmates' wrist's and are non-removable without cutting, breaking, or tearing them off.

89. Some inmates are serving lengthy sentences of incarceration ranging from a few years up to life without parole.

90. The wristbands worn by the Representative's and inmates at the BCCX consist of about 5 layers of plastic, are 1½" wide, about 1/32" thick, by diameter of wrist in length.

91. The wristbands are worn 24 hours a day, 7 days a week, indefinitely.

92. Item's other than the wristbands worn by inmates can be removed for cleaning and/or sanitizing.

93. The wristbands have very little room for movement up and down on an inmates arm.

94. If the wristband could be removed, it would be impossible to thoroughly clean between the multiple layers of plastic without destroying or altering same.

95. There is not enough adequate movement of the wristband on an inmates arm to thoroughly clean it with it attached, and it would be difficult to do so with one hand.

96. BCCX inmates' wristbands are attached to their right wrist.

97. The majority of humans are right-handed.

98. About 93% of the Representative's are right-handed.

99. The majority of humans have a dominant hand, right or left, which is used more than their non-dominant hand to perform a number of tasks in relation to everyday life.

100. Approximately 85% of the Representative's wipe their butt with their right hand after defecating thereby exposing their wristband to possible contact with fecal matter.

101. If the wristbands were attached to inmates' left arms they would still be exposed to fecal matter by those who wipe with same, as well as the other conditions described herein.

102. Approximately 15% of the Representative's wipe their butt after defecating with their left hand.

103. Based on information and belief, the majority of inmate class members wipe their butt with their right hand after defecating thereby exposing their wristbands to possible contact with fecal matter.

104. Fecal matter may contain Enterohemorrhagic Escherichia coli ("E-coli"), other bacteria, and parasites.

105. Inmates who reach from the front to wipe their butt after defecating expose and/or contact their genetalia with their wristband.

106. Inmates who reach from behind to wipe their butt after defecating expose and/or contact their backside with their wristband where a fart may have lingered and left behind residue.

107. Based on information and belief the majority of the TDOC's female inmate class members insert and remove their sanitary napkin's, and/or tampon's, with their right hand thereby exposing their wristband to blood, other body fluids, and their genetalia.

108. All of the Represtative's who still have their permanent teeth brush same with their right hand.

109. When the bristles of a toothbrush spring off of the edges of teeth during brushing liquid particulates become airborne and land on nearby surfaces.

110. About 37% of the Representatives' gums occasionally bleed during brushing.

111. About 18% of the Representative's have occasional abscesses in their mouth.

112. An abscess contains the bacterium *staphylococcus* which is a poisonous substance. [ See e.g., *Fishbein's Illustrated Medical & Health Encyclopedia* Volume 2 of 4 at 647-48, Copyright © 1977, 1978, 1983 by H.S. Stuttman, Inc. (Morris Fishbein, M.D.) (hereafter collectively "Fishbein's"); see also, *staphylococcus*, *Webster's New World College Dictionary Fifth Edition*, Copywright © 2016, 2014 Houghton Mifflin Harcourt Publishing Company (hereafter collectively

Case 1:19-cv-00296-HSM-SKL   Document 1   Filed 10/25/19   Page 16 of 45   PageID #: 16

"Webster's")]

113. *Fishbein's* is a set of medical encyclopedia's that are provided by the BCCX, and therefore Parker, Dodson, and the TDOC for inmates to research medical issues.

114. Parker and Dodson have access to the *Fishbein's* medical encyclopedia's that are located at the BCCX in the Site 2 library, as they are TDOC property.

115. Saliva contains bacterium and potentially pathogens.

116. The wristbands of both male and female inmates are subject to urine exposure and contamination when they relieve their bladders.

117. The toilets at the BCCX flush about 3.5 gallons of water in about 6 seconds.

118. 3.5 gallons of water being flushed down about a 2.5" hole in 6 seconds causes liquid particulates to become airborne.

119. Representative Adams has personally observed water particulates become airborne when flushing his toilet, as well as other toilets in the prison, and has observed droplets of water around the rim of the bowl and on the seat thereafter.

120. When inmates flush their toilets containing feces or urine with their right hand their wristband is contaminated with the liquid particulates that become airborne while withdrawing their hand from the flush handle.

121. Inmates working in the "tray room" at the BCCX bang excess food off of the trays that others have consumed food on into recycle/compost barrels.

122. Most inmate tray room worker's bang the excess food off of the trays with their right hand, where their wristband is located.

123. The trays that others have consumed food from, as well as the cups and plasticware, have the consumer's saliva and any bacteria and/or pathogens contained on their surfaces.

124. When the tray room worker's bang the excess food and liquids off of the trays airborne particulates contaminate their wristband.

17

125. Approximately 90% of the Representatives cough and/or sneeze into their right elbow or hand.

126. The majority of humans cough and/or sneeze into their right elbow or hand.

127. The right elbow of a human is in close proximity to the right wrist where inmates' wristbands are attached.

128. TDOC inmates utilize common shower areas for bathing while wearing their wristbands.

129. For some odd reason a number of inmates at the BCCX Site 2 blow their noses while in the shower.

130. When a person coughs, sneezes, and/or blow's their nose openly and uncovered mucous and any pathogens contained therein are propelled up to and in excess of 20 feet. [*Fishbein's* Volume 1 at 373]

131. When a person coughs and/or sneezes into their elbow everything in close proximity thereto is contaminated by the liquid particulates expelled therefrom when they become airborne.

132. Inmates wear the wristbands while performing their jobs in the prison system thereby contaminating them on the surfaces, and/or with other conditions, that they come in contact with.

133. Commercial Cleaners / Rockmen clean the showers and other common areas shared by inmates and others.

134. Maintenance Men unclog and work on toilet's, shower's, drain's, and other items in need of repairs.

135. Sanitation / Recycle / "Trash Pit" Worker's sort through the prison's trash to extract recyclable materials.

136. Laundry Worker's handle soiled clothing, bed linens, and cleaning rags that are used to clean the prison's.

137. Some Commercial Cleaners work in the clinic where blood is drawn, and where inmates who are sick and/or have communicable diseases go for medical attention thereby cleaning-up

18

behind same.

138. Some inmates at the BCCX annex work with cattle.

139. Cattle are carriers of zoonotic related diseases and parasites.

140. Food that is consumed by the BCCX's annex is prepared on the compound in the general population kitchen and then sent to the annex.

141. The food that is consumed in the annex dining hall is transported and served from equipment that travels back and forth from the general population kitchen.

142. BCCX annex inmates share a common dining hall.

143. The wristbands have caused an allergic reaction for some inmates thereby causing them to contract a rash on their arm where the wristband is attached.

144. "The list of items to which a particular person may be hypersensitive grows longer as new chemical compounds are developed and used in everyday life. Substances known to produce allergic contact dermititis include... plastics." [ *Fishbein's* Volume 2 at 388 ]

145. "Redness, blisters, hives, fissures, watery discharges, and peeling accompanied by itching, burning, or soreness are characteristic signs of dermititis." [ *Id* ]

146. The wristbands constant contact with inmates' body heat and the ample moisture from showering and handwashing make the wristbands the equivalent of a petri-dish used to culture, up to and including but not limited to, bacteria, viruses, fungi, parasites, and other microorganisms / pathogens.

147. A lay person can clearly identify mold growing within the multiple layers of some of the wristbands, and the Representative's have.

148. About 65% of the Representative's have noticed and/or experienced increased instances of, up to and including but not limited to, common colds, persistent coughs, diarrhea, and vomitting since the inception of the wristbands.

149. The wristbands worn by inmate's at the BCCX have sharp edges and/or corners that have

caused all of the Representative's to scrape and/or scratch themselves with same thereby creating abrasion's on their skin.

150. One Representative accidentally scratched his 5 year old nephew with his wristband during visitation thereby creating an abrasion on his nephew's skin.

151. Other inmates have scratched visiting children while interacting with them thereby creating abrasion's on their skin.

152. An abrasion is "a superficial injury to the skin... [and] should not be taken lightly, as they are highly susceptible to infection." [*Fishbein's* Volume 1 at 23]

153. Inmates work, enjoy recreation, and otherwise interact with one another in close proximity to same throughout each day.

154. The majority of people sweat when they work and exercise.

155. Inmates' wristbands are contaminated by sweat.

156. Inmates' wristbands are exposed to some and/or all of the conditions and/or contaminates described herein.

157. All of the Representative's are personally affected by the wristbands as described herein.

158. Some inmates have inadequate and/or poor personal hygiene practices.

159. Prison's and jail's are highly susceptible to communicable disease outbreaks.

160. In preparation for this litigation Representative Adams made a document request to the United States Department of Health and Human Services, Centers for Disease Control and Prevention ("CDC") through the Freedom of Information Act ("FOIA") on July 22, 2019. The CDC assigned said request as # 19-01011-FOIA and in response provided Adams with 25 pages of documents that are attached hereto in the "Appendix of Exhibits" as Exhibit 3, pages 19-45; see esp. 19-20.

161. Hepatitis B is transmitted through blood, mucous, and other body fluids. [*Id* at 21 "routes of transmission"]

162. Hepatitis C is transmitted through blood through a "[n]eedlestick or other sharp instrument

20

injuries". [ Id at 21 " routes of transmission ]

163. The TDOC has more than 4,000 inmates in its custody with hepatitis C. [ See e.g., Atkins et al. v. Parker et al., Case No. 3:16—cv—1954 (M.D. Tenn.) ]

164. The TDOC has inmates in its custody with hepatitis B. [ Id ]

165. While inmates are interacting during work and recreational activities they are subjected to the possibility of being scratched, cut, or scraped by the sharp edges and/or corners of other inmates' wristbands if they come in contact with same.

166. While interacting with inmates C/O's sometimes have to break-up fights and/or otherwise restrain unruly inmates and are therefore subjected to the possibility of being scratched, cut, or scraped by the sharp edges and/or corner's of inmate wristbands.

167. While interacting with inmates, volunteers are subjected to being scratched, cut, or scraped by the sharp edge's and/or corner's of inmate wristbands.

168. While interacting with inmates, visitors are being, and are subjected to being, scratched, cut, or scraped by the sharp edge's and/or corner's of inmate wristbands.

169. Based on information and belief, if an inmate with hepatitis B, hepatitis C, or another blood transmissible communicable disease scratches, cuts, or scrapes themselves on their wristband thereby drawing blood, or, contaminates their own wristband with their blood while brushing their teeth or in some other way, and then, scratches, cuts, or scrapes another inmate, C/O, visitor, or volunteer with the pathogen containing wristband, there is an imminent risk of spreading the communicable disease.

170. Hepatitis A is transmitted through the "ingestion of fecal matter, even in microscopic amounts, from: close person-to-person contact with an infected person...[and] ingestion of contaminated food or drinks." [ Ex.3 at 21 " routes of transmission ]

171. All types of viral hepatitis "can include one or more of the following [symptoms]: fever, fatigue, loss of appetite, nausea, vomitting, abdominal pain, gray-colored bowel movements,

joint pain, [or] jaundice ". [ Id at 21 " symptoms of acute infection " ]

172. Hepatitis B and C may cause death. [ Id at "severity" ]

173. "[T]he term hepatitis means any inflammation of the liver, it is generally used to refer to the acute and highly contagious disease of the liver more properly called *infectious hepatitis*." [ *Fishbein's* Volume 2 at 760-62 ]

174. "Infectious hepatitis is caused by a virus and is spread by drinking water and eating food that has been contaminated by the feces of people infected with the disease." [ Id ]

175. "Infectious hepatitis is best prevented by the strict supervision of sanitary conditions in camps and public places such as restaurants, schools, and the like." [ Id ]

176. Inmates working in the food department of each respective prison that houses TDOC inmates are wearing wristbands while handling, preparing, and serving food to other inmates and correctional officials.

177. Inmates working in the *Culinary Arts* class at the BCCX are wearing wristbands while handling, preparing, and serving food to inmates, correctional officials, and volunteers.

178. Inmates are personally handling, preparing, and consuming food purchased from the commissary while wearing a wristband.

179. The wristbands' multiple layers separate thereby making pieces that break-off of same potential physical contaminates for food in addition to the biological contaminates on the piece that breaks off.

180. A physical contaminate such as plastic ingested by a human is dangerous as it may become lodged in, and/or cut the digestive system.

181. Inmates' wristbands come in contact with food-contact surfaces in the prison's kitchen, including the *Culinary Arts* class's.

182. While working in the kitchen Represtative Smiley wears a wristband and has observed inmates' wristbands coming in contact with food-contact surfaces.

22

183. While assisting the Baker in the kitchen to butter and prep pans for baking, Representative Smiley's wristband came in contact with the butter and pans.

184. Based on information and belief, other inmates' wristbands are coming in contact with food, and/or pots, pans, utensils, and equipment used in the preparation thereof at the BCCX and at the other prison's in the state.

185. While working in the kitchen, dining hall, or any other area in the prison, as the wristbands move up and down on the arm's of inmates, bacteria and dead skin are being scraped off of their arm's by same thereby contaminating the food and surfaces where such takes place. [See ¶ 279 infra]

186. The inmates who work in the kitchen's at each respective prison in the state wear a wristband while handling, preparing, and serving meats, poultry, raw produce, etc., and/or come in contact with such surfaces where same is accomplished thereby collecting bacteria from same, and then, cross-contaminate other areas in the prison when their contaminated wristband comes in contact with such.

187. When an inmate pushes their wristband up out of the way with his bare or gloved hand, their hand becomes contaminated, and therefore, contaminates all of the surfaces that are touched by same thereafter.

188. The use of gloves is not always an effective means for preventing contamination and can actually make matters worse. [See e.g., Ex. 3 pp. 34-42]

189. Inmates' wristbands come in contact with the trays, cups, and plasticware that is used to consume meals with by those who consume prison furnished food.

190. Inmates' wristbands are coming in contact with the tables that are used in their respective housing unit's to prepare and consume food purchased by them personally from the commissary.

191. Inmates' wristbands are being worn while they prepare and consume food in the visitation galleries with their family and friends.

192. Inmates wristbands are coming in contact with the tables and other surfaces that are

used to prepare and consume food with in the visitation galleries while visiting with their family and friends.

193. Inmates' wristbands are coming in contact with their face's while they sleep and at other times.

194. Inmates' wristbands come in contact with their hair.

195. Inmates' wristbands are coming in contact with surfaces used by themselves, or, surfaces in common areas shared by other inmates, correctional officials, visitors, and volunteers, up to and including but not limited to, tables, door knobs or handles, phones, walls, chairs, sinks where hands are washed, etc..

196. The prison's throughout the state have inmates who are wearing wristbands that bag, and/or distribute by other means, ice that is consumed by inmates and correctional officials.

197. The prison's throughout the state have inmates who are wearing the wristbands while they prepare kegs of ice water to be consumed by inmates and correctional officials.

198. Some correctional officials have the option to, and do, consume one meal per day that is prepared by inmates in the prison's food service department where inmate labor is used in the preparation and serving of same.

199. Some volunteers who do work at the BCCX occasionally have the option to, and do, consume food prepared by inmates in the *Culinary Arts* class who wear wristbands.

200. Mosquito's, bird's, and some other wildlife freely enter and exit the prison's.

201. Wildlife are carriers of bacteria, viruses, fungi, parasites, and the like.

202. Correctional officers and supplies that come from places outside of the prison may transport bacteria, viruses, fungi, parasites and the like into each respective prison.

203. Once the bacteria, viruses, fungi, parasites, and the like are transported into each respective prison by wildlife, correctional officers, and supplies, they are further carried from one area to another on wristbands.

204. Food and water are basic necessities that are required to sustain human life.

24

205. Inmates in the custody of the TDOC are dependant upon Parker and Dodson to provide them with safe drinking water and sanitarily handled, prepared, and served food.

206. The TDOC will not permit inmates to leave the prison's to consume food and then return thereto prior to the expiration of their sentences or release on parole.

207. Inmates are dependant on Parker and Dodson to provide them with a safe and sanitary environment to serve their term of incarceration.

208. The TDOC has contracted and delegated the operation of its food service department to a private-sector contractor called Aramark.

209. On August 13, 2019 Represtative Adams questioned Aramark's BCCX Director of Food Services Will Sarrell about inmates wearing wristbands while handling and preparing food in violation of state law. Mr. Sarrell reponded that he had no control over TDOC's policy requiring inmates to wear wristbands.

210. Aramark is required by contract to comply with TDOC policies in its operation of TDOC's food services department.

211. Because of the TDOC's requirement that all inmates housed in the general population of prison's that house TDOC inmates wear wristbands, the class is in imminent danger of spreading and contracting communicable diseases, such as, but not limited to, bacterial infections, viral infections, fungal infections, parasitic infections, and/or any other pathonegenic substances.

212. The class is at a highly susceptible risk of contracting foodborne and/or other serious illness which may lead to death because of having to wear the wristbands.

213. "According to the Centers for Disease Control and Prevention (CDC), it is estimated that every year in the United States there are

• 47.8 million cases of foodborne illness

• 127,839 hospitalizations from foodborne illness [and]

• 3,037 deaths linked to unsafe food ".

25

[ *The Culinary Professional*, Second Edition, page 98 ; Published by The Goodheart-Willcox Company, Inc., Copyright © 2014 ( hereafter collectively " *The Culinary Professional* " ) ]

214. The CDC "estimates that only 1 out of 38 cases of *Salmonella* is reported to them." [ *Id* ]

215. "The improper handling of food can result in foodborne illness for those who consume such; which may cause nausea, fever, weakness, vomiting, diarrhea, and death." [ *Id* ]

216. "Foodborne illness is caused by contaminated food." [ *Id* ]

217. " "*Contamination*" refers to the presence of unsafe substances or levels of dangerous microorganisms in food." [ *Id* ]

218. "Proper sanitation prevents contamination." [ *Id* at 98-99 ]

219. "*Sanitation* is the creation and practice of clean and healthy food-handling." [ *Id* ]

220. "Contamination can result from biological, chemical, or physical hazards." [ *Id* ]

221. "*Biological hazards* are harmful organisms that cause foodborne illness. This source of contamination is the most troublesome for foodservice." [ *Id* at 99 ]

222. "The illness that results can range from mild discomfort to life threatening." [ *Id* ]

223. "These biological hazards, or pathogens, include harmful bacteria, viruses, fungi, parasites, and fish toxins." [ *Id* ]

224. "A *pathogen* is an organism that causes illness in humans." [ *Id* ]

225. "A type of pathogen responsible for many foodborne-illness outbreaks is bacteria." [ *Id* ]

226. "*Bacteria* are single-celled organisms that reproduce by dividing." [ *Id* ]

227. "Bacteria" are everywhere. They surround us by the billions." [ *Id* ]

228. "When bacteria have all of their needs met, they reproduce rapidly." [ *Id* at 100 ]

229. "Bacteria reproduce by dividing." [ *Id* ]

230. "If conditions are ideal, [ bacteria ] can divide every 20 minutes. At that rate, one cell can turn into over 250,000 bacteria cells in six hours." [ *Id* ]

231. "As the number of bacteria increase in food, so does the possibility of a foodborne illness." [ *Id* ]

232. "Some bacteria have an added survival mechanism — the ability to form spores." [ *Id* ]

233. "A *spore* is a thick-walled, "supersurvival unit". " [ *Id* ]

234. " If conditions threaten the bacterium's existence, it may produce a spore." [ *Id* ]

235. "Pathonegenic bacteria cause foodborne illness in one of the following ways :

  • *Infection* is illness resulting from live bacteria. These bacteria must be ingested to
    be a threat.

  • *Intoxication* is illness resulting from ingestion of toxins left behind by bacteria. Toxins
    are poisonous substances that are harmful to humans. To become ill, you do not need to
    ingest the bacteria, but simply their toxic residue. Toxins are troublesome because you
    may succeed at killing the bacteria without affecting the toxins. Some toxins are both
    difficult to detect and deadly.

  • *Toxin mediated infection* occurs when bacteria are ingested and then produce
    harmful toxins while in the human digestive tract." [ *Id* ]

236. "Bacteria need warm conditions to grow." [ *Id* at 102]

237. Bacteria "reproduce rapidly in the *temperature danger zone* which is between 41°F
and 135°F." [*Id*]

238. The TDOC's facilities are climate controlled thereby maintaing temperatures that average
between 65°F and 75°F

239. Over a 4 day period Representative Adams checked the surface temperature of his arm in
the area where his wristband is worn 7 times at varying times which maintained a collective average
temperature of 85.5°F.

240. "Above the temperature danger zone, biological hazards begin to die. However, some
bacteria form heat protective spores. Many toxins produced by bacteria are not destroyed by heat
either." [ *Id* ]

241. "Bacteria are small, but viruses are even smaller. A *virus* is a very small organism

27

that invades another cell and causes it to reproduce the virus. Without a cell host, viruses can survive but cannot reproduce." [*Id* at 104]

242. "Most viruses are destroyed by high heat. However, some viruses are unaffected by heat." [*Id*]

243. "Two viruses that concern foodservice are hepatitis A and Norovirus ("Norwalk virus")." [*Id* at 105]

244. "Hepatitis A causes liver damage." [*Id*]

245. "The Norwalk and other Norwalk-like viruses caused an estimated 5,461,731 illnesses in 2011 according to the...[CDC]." [*Id*]

246. Hepatitis A, Norwalk, and Norwalk-like "viruses are excreted in the feces of infected people. Individuals become sick when they consume contaminated water or foods." [*Id*]

247. Mold is a type of fungi. [*Id* at 105-106]

248. "There are a few molds that produce toxins that are dangerous to humans." [*Id*]

249. "Temperatures above 140°F (60°C) kill molds but their toxins may not be affected." [*Id*]

250. "[B]iological hazards pose the greatest threat to foodservice." [*Id* at 113]

251. "Freezing kills some biological hazards, but more often that is not the case. Instead, freezing simply renders them dormant." [*Id* at 117]

252. "Another important factor that poses a risk to safe food is cross-contamination." [*Id* at 118]

253. "*Cross-contamination* occurs when harmful microorganisms are transferred from one product to another by hands, utensils, equipment, or other physical contact." [*Id*]

254. Cross-contamination "is one of the largest sources of foodborne illness." [*Id*]

255. "Cross-contamination is often the result of negligence or ignorance on the part of the foodservice worker." [*Id*]

256. "Hands are often the vehicles that transfer a contaminant." [*Id*]

257. "There is a difference between clean and sanitary. *Clean* describes a condition of being free of dirt, grease, or grime. A counter or piece of equipment may be clean, but may not be sanitary." [*Id* at 119]

258. "*Sanitary* refers to an environment that is free from pathogens.... [B]iological hazards are often not visible to the naked eye." [*Id*]

259. "Any surface such as a table, cutting board, or piece of equipment that comes in contact with food is considered a *food-contact surface*." [*Id*]

260. "Food-contact surfaces can harbor, or be home to, pathogens and lead to cross-contamination." [*Id*]

261. "[I]f an item such as a box of produce or chef's toolbox is placed on a worktable, the table must be sanitized once the item is removed." [*Id* at 120]

262. "[S]mall equipment and dishes must be properly stored in a designated area after cleaning and sanitizing to protect them from contaminates." [*Id* at 123]

263. Humans "are one of the main vehicles for food contamination." [*Id* at 125-126]

264. "The human body is a perfect environment for breeding and carrying biological hazards." [*Id*]

265. "Good personal hygiene helps you avoid being a source of contamination in the kitchen." [*Id*]

266. "Hands... are the most likely source of contamination on the human body. Every time you touch or work with food, your hands become contaminated." [*Id* at 126]

267. "Every time you use the restroom, touch your hair, or scratch your skin, bacteria are transferred to your hands." [*Id*]

268. "Fingernails, jewelry [/wristbands], and open cuts or burns on your hands can harbor dangerous bacteria." [*Id*]

269. "During food preparation, the only jewelry that should be worn on an employee's hands or arms is a plain wedding band." [*Id*; see also Ex. 3 p. 23]

270. "Hair is a notorious breeding ground for bacteria." [*Id* at 127]

271. Another book used by the *Culinary Arts* class at the BCCX affirms what is alleged in paragraphs 213-270 which refer to *The Culinary Professional*. See e.g., ServeSafe Coursebook 6th Edition, © National Restaurant Association Educational Foundation (hereafter collectively "ServeSafe"). Parker and Dodson both have access to *The Culinary Professional* and ServeSafe books

29

since they are the property of the TDOC., and, what they provide to teach and train inmates about sound sanitary practices for foodservice operations.

272. Food can become contaminated by "physical" objects. [ServeSafe at 1-4]

273. "Foreign objects such as metal shavings, staples, [wristband pieces,] and bandages can get into food." [Id]

274. "Food handlers can cause a foodborne illness if they do any of the following actions:

   · Fail to wash their hands correctly after using the restroom,

   · Cough or sneeze on food,

   · Touch or scratch wounds and then touch food". [Id at 1-5]

275. "Food handlers can also pass on pathogens when they are in contact with a person who is sick. Some pathogens are passed very easily in any of these ways:

   · From person to person

   · Through sneezing or vomiting onto food or food-contact surfaces

   · From touching dirty food-contact surfaces and equipment and then touching food". [Id at 2-2]

276. "According to the Food and Drug Administration (FDA), there are over 40 different kinds of bacteria, viruses, parasites, and molds that can occur in food and cause a foodborne illness. Of these, six have been singled out by the FDA. These have been dubbed the "Big Six" because they are highly contagious and can cause severe illness.

They include:

   · *Shigella* spp.

   · *Salmonella* Typhi

   · Nontyphoidal *Salmonella* (NTS)

   · Shiga toxin producing *Escherichia coli* (STEC), also known as *E. coli*

   · Hepatitis A

   · Norovirus ". [Id at 2-3; see also Ex.3 pp. 24 and 30-33]

30

277. Food handlers can contaminate food when they have "[w]ounds that contain a pathogen." [*ServeSafe* at 4-2]

278. "Some people also carry pathogens and infect others without getting sick themselves. These people are called *carriers*." [*Id* at 4-3]

279. "The bacteria *Staphylococcus aureus* is carried in the nose of 30 to 50 percent of healthy adults. About 20 to 35 percent of healthy adults carry it on their skin as well. Food handlers transfer this bacteria to food when they touch the infected areas of their bodies and then touch food." [*Id*]

280. "Bacterial infection...is passed from person to person, mainly in the droplets in the air, in food and water, in human excrement, by flies and by the bite of insects." [*Fishbein's* Volume 3 at 834]

281. Boils and abscesses contain the poisonous substance *staphylococcus* and "such an infection on the hands or arms of anybody preparing food can poison many others.... [S]taphylococcus poison retains its potency even after half an hours boiling. Normally, staphylococci are found in the human nose and throat ...". [*Id* Volume 2 at 647-48]

282. Representative Adams occasionally gets boils. [See also ¶ III *supra*]

283. Based on information and belief, other inmates in the TDOC's custody get boils.

284. An inmate that cares for a boil while wearing a wristband exposes and/or contaminates same with the poison contained therein.

285. "Simple acts, such as running fingers through the hair, wiping or touching the nose, rubbing an ear, scratching the scalp, or touching a pimple or an infected wound can contaminate food." [*ServeSafe* at 4-3]

286. Food preparers are to "[r]emove jewelry from hands and arms before prepping food or when working around prep areas.... Do not wear any of the following:

       • Rings, except for a plain band

       • Bracelets, including medical bracelets

       • Watches". [*Id* at 4-9]

31

287. Jewelry can" be difficult to clean and can hold pathogens." [ Id ]

288. Aramark has signs posted in the BCCX Site 2 kitchen and dining hall that prohibits the wearing of watches and bracelets by their employees.

289. Regardless of Aramark's prohibition of employees wearing watches and bracelets, their inmate employees are wearing wristbands while working in the BCCX Site 2 kitchen.

290. Based on information and belief all general population Aramark inmate employees throughout the whole state are wearing wristbands while working in the kitchen.

291. *Tennessee Rules & Regulations* ("Tenn. R. & Regs.") Chapter 1200-23-01-.02 , page 32 (3)(g), which is promulgated by the TDOH, states that "[e]xcept for a plain ring such as a wedding band, while preparing food, food employees may not wear jewelry including medical information jewelry on their arms and hands." [See also, Ex. 3 at 23 ]

292. " *Staphylococcus* and *E. coli* [are] the bacteria most frequently found when" foodborne illness outbreaks occur. [ See e.g. Ex. 3 at 25-28 , *Mengual Lombar M, Gomez NM, Carcedo I, Lopez MA, Alava JI* (2016) *Accessories of Food Handlers and Restaurant Staff as a Source for Food Contamination . J Food Microbial Saf. Hyg.* 1:105. doi : 10. 4172/2476-2059.1000105 ]

293 . In light of the facts described herein, the wearing of wristbands/bracelets by inmates while preparing food, whether in the foodservice department, the *Culinary Arts* class, for personal consumption in the housing units, or with visitors in the visitation gallery poses an imminent biological health hazard to the class and may cause foodborne illnesses, and communicable diseases which may lead to death.

294. It is just as dangerous for inmates to prepare personal food for personal consumption while wearing a wristband as it is for a foodservice worker to handle, prepare, and serve food to others.

295. " Hand hygiene is critical during preparation of any food, whether in the home or in the food processing or food service environment...". [ Ex. 3 at 34; *Journal of Food Protection*, Vol. 73, No. 9, 2010, at 1762-73 , Copyright © International Association of Food Protection ; see also pp. 35-42 ]

32

296. As of March 31, 2019 the TDOC had 21,871 inmates in its custody, which means that between approximately 6,561 to 10,935 inmates have *staphylococcus aureus* in their noses. [See ¶¶ 126, 179 *supra*]

297. Approximately 4,374 to 7,654 inmates in the TDOC's custody have *staphylococcus aureus* on their skin. [*Id* ; See also ¶ 185 *supra*]

298. Inmates who die as a result of contracting a communicable disease transported and/or transmitted by the wristbands as described herein leave behind families who suffer emotionally and financially as a result thereof.

299. Inmates who contract a communicable disease that is transported and/or transmitted by the wristbands as described herein create an unnecessary and preventable financial burden on their families, the TDOC, and taxpayers in medical expenses and loss of work.

300. Inmates who contract a serious illness, foodborne illness, or communicable disease as a result of the wristbands and conditions described herein will suffer unnecessary pain that is preventable.

UNSAFE CONDITIONS OF THE WRISTBANDS / PHYSICAL HAZARD.

301. Tennessee's General Assembly has commanded that Tennessee's inmates "shall be required to perform some type of work... [and] [w]here possible, the labor should be directed toward projects such as the manufacture or production of building materials." *Tennessee Code Annotated (T.C.A.")* § 41-1-402 (1) and (2). [See also, *T.C.A.* § 41-21-207]

302. The Tennessee General Assembly has commanded for the TDOC to have "due regard to that employment that is most profitable" for inmates when assigning them to same. *T.C.A.* § 41-21-210.

303. The Tennessee General Assembly has created the Tennessee Rehabilitative Initiative in Correction ("TRICOR") to operate free-world type manufacturing jobs in a partnership with the TDOC and free-world private sector companies thereby utilizing inmate labor. [ See e.g. *T.C.A.* §§ 41-6-201 et seq. and 41-22-401 et seq. ]

304. TRICOR is required to comply with TDOC policies in relation to its operations inside of TDOC facilities regarding inmates, to wit, allowance of inmates to wear wristbands at work. [Ex.1 at 3 §III ]

305. TRICOR operates various manufacturing plants throughout the state whereby inmates work on or around machinery / equipment in the performance of their jobs.

306. The Tennessee General Assembly has further directed the TDOC to prepare "inmates [to] be more profitably employed in TRICOR programs for their own welfare and the welfare of the state." T.C.A. § 41-22-118.

307. In accordance with legislative intent and direction, TDOC Policy 505.07, Inmate Programming (Jobs/Classes/Treatment) was promulgated "to provide meaningful jobs... and to provide a system for job advancement by establishing a uniform procedure for assigning inmates to institutional programs." [Id at §II.; Ex.4 at 46; also available at: < htts://www.tn.gov/assets/entities/correction/attachments /505-07.pdf >]

308. "Inmates may be assigned to positions without their request or consent" with the exception of very few positions. [Ex.4 at 54 (F)(7)]

309. Inmates may take more dangerous jobs out of necessity because they pay a higher wage and they need such to have a means to provide for their financial needs and prepare for a successful re-entry back into society.

310. Inmates who refuse an assignment are charged with a Class A disciplinary infraction for "refuse to participate" and are subjected to the consequences thereof if convicted of same. [Ex.2 at 7 #55, also available at: see ¶ 68 supra ; see also ¶ 69 supra]

311. A number of inmate class members are assigned to jobs such as: HVAC Mechanic, Electrical Appliance Servicer, and Electrical Repair that at times require them to work on or around live energized electrical circuits.

312. Metal is a conductor of electricity.

313. The wristbands are secured to inmates' wrist's "with metal dual-grip fasteners". [Ex. 1 at 8 (E)(5)]

314. A spark can jump from an energized electrical circuit to a conductor.

34

315. An inmate that has a wristband secured to his wrist "with [a] metal dual-grip fastener" and is required to work on a live energized electrical circuit is in imminent danger of a spark jumping from the circuit to the metal fastener on his wristband.

316. An inmate that is required to work on or around a live energized electrical circuit while wearing a wristband is in imminent danger of it snagging on a part of the equipment thereby causing the inmate to pull and/or jerk into the live circuit and therefore causing him to be electrocuted.

317. When a person suffers from an electrical injury resulting from being electrocuted they are subjected to the possibility of a severe burn, violent muscle spasms that may cause broken bones, and/or cardiac arrest which may be fatal. [ *Fishbein's* Volume 2 at 524]

318. A number of class member inmates are required to operate various kinds of machines / equipment with exposed moving parts as part of their jobs.

319. The Baker, Cooks, and Kitchen or Cook helpers in the kitchen operate , *inter alia*, a meat slicer and large industrial type mixer.

320. The "tray room" workers operate the tray, cup, and ware sanitizing machine.

321. Laundry workers operate large industrial washers and dryers.

322. Carpenter's operate drills, saws, concrete mixers, jackhammers, etc..

323. Welder's operate drill presses, band saws, grinders, etc..

324. Students in vocational classes operate drill presses, miter saws, table saws, belt sanders, jointers, routers, planners, and various other shop related equipment.

325. Tractor operators operate same with various attachments attached thereto and powered by the power take off drive ("PTO").

326. TRICOR workers throughout the state operate sewing machines, portable band saws, grinders, and various kinds of manufacturing equipment.

327. Inmates perform an assortment of other jobs that require them to operate various kinds of machinery / equipment.

35

328. It is dangerous to work on energized electrical circuits with metal on your hands and/or arms.

329. It is dangerous to work on and/or operate machinery/equipment with moving parts while wearing loose fitting clothing, rings, watches, and bracelets.

330. Parker and Dodson, as reasonable officials, were aware of the dangers described in paragraphs 328-29 above.

331. One class member tested the strength of his wristband by suspending his entire body-weight from same and it held firm and carried his weight without breaking.

332. Inmates working on or near machinery/equipment with moving parts are in imminent danger of the wristband being snagged by same thereby pulling them into such.

333. An inmate that is pulled into machinery/equipment with moving parts by a wristband is in imminent danger of being maimed and/or killed.

334. Inmates are continuously snagging the wristbands on various items that they come in contact with throughout their daily activities thereby causing sudden jerking stops.

335. Sudden jerking stops place inmates in imminent danger of sprains and/or broken bones when their full body-weight and the momentum thereof jerks against their wrist.

336. Inmates working in the kitchen are in imminent danger of their wristband snagging on cooking equipment and causing them to jerk into same which may result in severe burns.

337. Inmates working in the kitchen are in imminent danger of their wristband snagging on a pot or pan with an extremely hot substance therein and pulling it off of the cooking surface causing the contents to spill on themselves or someone else thereby resulting in severe burns.

338. "Jewelry does not belong in the kitchen. Rings, necklaces, earrings, and bracelets can get caught on moving equipment and cause serious injury." [The Culinary Professional at 137]

339. Inmates are dependant on Parker and Dodson to provide them with a safe work and living environment.

340. Inmates who are maimed while working at mandatory or necessary unsafe jobs because of the

36

wristbands as described herein may have difficulty obtaining employment upon release.

341. An inmate who has difficulty gaining employment after release will impose an additional burden on their family and/or taxpayers.

342. Inmates who die as a result of the type of imminent injuries as described herein leave behind families who suffer emotionally, and, financially from lost future income as a result thereof.

343. Inmates who are maimed and/or electrocuted as a result of the wristbands as described herein will suffer unnecessary pain that is preventable.

344. Inmates who are maimed or electrocuted as a result of the wristbands as described herein will create an unnecessary and preventable financial burden on the TDOC, and therefore, taxpayers for the costs related thereto in medical treatment and litigation costs.

## DELIBERATE INDIFFERENCE TO THE HEALTH AND SAFETY OF INMATES; AND, EXHAUSTION OF ADMINISTRATIVE REMEDIES.

345. Parker put forethought into the health and safety aspects of the wristbands when he approved and promulgated TDOC Policy 506.13 § VI (E), Identification of Inmates (the "regulation").[Ex. 1 at 8 (E); or internet cite address available at ¶ 52 *supra*]

346. Parker commanded that the wristbands "shall be made of a hypoallergenic material."[*Id* at (5)]

347. Parker commanded that the "[w]ristbands shall meet or exceed TOSHA safety regulations for those working in areas with machinery or heavy equipment."[*Id*]

348. Dodson participated in the creation of the regulation and enforces same.

349. Dodson approved the wristbands worn by the Representatives.[*Id*]

350. The Defendant's have approved and promulgated in TDOC Policy 116.05 § V, Sanitation of Food Services, that "[t]he TDOC shall operate the food service program in accordance with the most current Food Service Establishment Regulations established by the Tennessee Department of Health (TDOH)."[Ex. 5 at 76 § V; also available at: < htts://www.tn.gov/assets/entities/correction/attachments/116-05.pdf >]

351. The Defendant's have commanded compliance with all "health related regulations established by the TDOH."[Ex. 5 at 78 (3)]

37

352. Tennessee's Legislature has caused legislation to be enacted which is "cited as the "Tennessee Food Safety Act". " T.C.A. §§ 68-14-701 et seq..

353. The purpose of the *Tennessee Food Safety Act* is "to ensure that foods served for public consumption are safe as prepared, served, and delivered." T.C.A. § 68-14-702.

354. Tennessee's Legislature has exempted a number of food service establishment's from coverage under the *Tennessee Food Safety Act*, however, prison's are not one of them. T.C.A. § 68-14-703(9).

355. The Tennessee Department of Health was created by Tennessee's Legislature.

356. Tennessee's Legislature has delegated its authority to the TDOH to promulgate rules and regulations for the enforcement of the *Tennessee Food Safety Act*. T.C.A. § 68-14-704.

357. The TDOH's regulations, as set forth in *Tennessee Rules & Regulations* ("Tenn. R. & Regs.") Chapter 1200-23-01 for food service establishments, are the law in the state of Tennessee in relation thereto.

358. The regulations established by the TDOH are what Tennessee has determined to be the decent standards of their society by virtue of the authority vested in the TDOH based on its experience and understanding in relation to food safety, and other health-related matters.

359. The Defendant's are responsible for complying with and enforcing state law in the discharging of their duties for the TDOC.

360. The Defendant's are responsible are for complying with the United States Constitution in the discharging of their duties for the TDOC.

361. The TDOH prohibits the wearing of "jewelry including medical information jewelry on [the] arms and hands " of food employee's while preparing food. [ *Id* at 1200-23-01-.02, p. 32 (3)(g); see also Ex. 3 at 23, 25-28, 34 ]

362. The Defendant's have approved, promulgated, and commanded for precautions to be taken to prevent the spread of communicable diseases. [ Ex. 6 at 87-101, TDOC Policy 113.42, Communicable Diseases; also available at: < htts://www.tn.gov/assets/entities/correction/attachments/113-42.pdf > ]

363. The Defendant's have knowledge that a communicable disease is "[a]n illness due to infectious

38

agents such as, but not limited to, bacteria, viruses, fungi, or parasites, that may be transmitted by physical contact or airborne droplets from an infected person to a well person, from an animal to a human being, or from an inanimate object (doorknob, telephone, tabletop, etc.) to a human being." [Ex. 6 at 87 § VI (A)]

364. The Defendant's have knowledge that "[h]epatitis A is transmitted through oral-fecal route, usually by food and water contaminated by feces." [/d at 90 (D)(2)(a)]

365. The Defendant's have knowledge that hepatitis B is transmitted through mucous, blood, and other body fluids. [/d at 92 (3)]

366. The Defendant's have knowledge of the hazards relating to "boils", "sores", "wounds", and "skin infections". [/d at 93 (7)]

367. It is common knowledge that hepatitis C is transmitted through blood by items such as an intravenous needle, tattoo needle, or other sharp instrument that has been exposed to the virus and then subsequently penetrates the skin of a non-infected person.

368. The TDOC and/or Parker have recently been involved in class action litigation in relation to hepatitis.

369. As a result of the class action hepatitis litigation Parker and/or the TDOC have knowledge of the dangers of hepatitis.

370. The Defendant's promulgation and enforcement of the regulation requiring inmates to wear wristbands was done with deliberate indifference to the health and safety of inmates, correctional officials, visitors, and volunteers who frequent facilities that house Tboc inmates when viewed in the light of the other policies that they have promulgated to protect the health and safety of prisoner's as described herein.

371. The Defendant's have promulgated in TDOC Policy 112.03, Occupational Health and Safety, "safety guidelines for employees and offender workers; to prevent the occurence of accident-producing conditions within work/program/vocational area(s)/unit(s)." [Ex. 7 at 102 § II ; also available at : < https://www.tn.gov/assets/entities/correction/attachments/112-03.pdf > ]

39

372. The Defendant's considered the safety aspects of the wristbands when promulgating the regulation, have created and promulgated safety related policies, and then knowingly and with deliberate indifference to the safety of inmates disregarded what they knew to be contrary to safe working and living conditions when they put the wristbands on inmates anyway.

373. Dodson approved the wristbands worn by inmates at the BCCX.

374. The Defendant's have intentionally placed inmates in imminent danger of being maimed, electrocuted, and/or killed by placing wristbands on inmates and then requiring them to work in the conditions described herein; or, causing the inmates to be charged with a serious disciplinary infraction if they refuse to do so.

375. Parker is a competent and reasonable official.

376. Dodson is a competent and reasonable official.

377. A reasonable official would know that compelling an inmate to work on or with machinery / equipment with moving parts, or to work on energized electrical circuits while wearing a wristband that is securely and permanently attached with a metal fastener, would put inmates in imminent danger of being maimed and/or electrocuted possibly leading to death.

378. The overall risk of harm in relation to the wristbands is obvious.

379. The unsanitary and unsafe conditions as described herein are not part of the inmate class members' sentence of punishment imposed and amounts to cruel and unusual punishment in violation of the Eighth Amendment of the United States Constitution, which is applicable to Tennessee through the Fourteenth Amendment of the United States Constitution.

380. All of the Representatives have filed and exhausted grievances through the TDOC's procedure that is established for same.

381. Dodson is the third and final level of the TDOC's grievance procedures and the decisions that he makes in relation thereto are not further appealable.

382. In response to the grievance's , Dodson concurred with the Warden's decision in relation to

40

to the wristbands, who concurred with the "response of supervisor of grieved employee or department", which was Associate Warden of Security Bert Boyd ("Boyd") who merely reiterated and recited the regulation. [Ex.8 at 107,108,119]

383. Boyd based his response to the grievances from Representative Adams's more exhaustive grievance; which a true and exact copy of is attached hereto in the Appendix of Exhibits as Exhibit 8 pages 107-131.

384. The TDOC uses a grievance board that is made up of 2 inmates and 2 correctional officials to recommend potential solutions to institutional problems.

385. The grievance board members live and/or work in the prison system.

386. The grievance board members have personal knowledge of the day to day operations and conditions of the prison.

387. The grievance committee / board found that "[t]he wristbands appear to be a health and safety issue. Recommend that this issue be reviewed and corrective action taken including the possibility of changing to a color code on the inmate ID cards." [Id at 121]

388. A number of the Representative's explained about having mold on their wristband, being cut by same, and working in the kitchen while wearing same noting that the gloves used therein do not cover same. [Id]

389. Covering the wristband with a glove is not the appropriate solution. [Ex. at 34-42]

390. Based on information and belief, in the competent performance of his duties, Dodson informed Parker of the issues set forth in the Representative's grievance's.

391. Representative Adams contemporaneously filed a petition for declaratory order with Parker in relation to the regulation, which included a copy of Adams's grievance.

392. Upon receipt of Adams's petition for declaratory order Parker referred same to the TDOC's Office of the General Counsel to review and respond to same on Parker's behalf.

393. On July 8, 2019 Douglas Stephens responded to the petition for declaratory order noting that

41

Adams's "request for action is on a departmental policy matter and is not subject to a declaratory order" under state law provisions. [Id at 131]

394. Based on information and belief, in the competent performance of his duties, Douglas Stephens informed Parker of the legal implications in relation to the concerns addressed about the wristbands, to wit, that it was a violation of state law for inmates to wear them while working in food services, among other things.

395. On July 22, 2019 Representative Adams drafted, and then placed in the U.S. Mail with sufficient postage shortly thereafter, a letter titled "Imminent Health Hazard Posed To TDOC Inmates And Civilians" setting forth some of the sanitary concerns of the wristbands again and mailed same to Parker, Dodson, and several others; a true and exact copy of same being attached hereto in the Appendix of Exhibits. [Ex. 8 at 126-130]

396. Parker is aware of the sanitation and safety concerns relating to the wristbands.

397. Dodson is aware of the sanitation and safety concerns relating to the wristbands.

398. The Defendant's have chosen to not take any remedial action in relation to the dangers posed by the wristbands despite the facts and concerns set forth in the grievance's, petition for declaratory order, and letter, which pointed out that the wristband's were in violation of state law, and, were unsanitary and dangerous in general. [Ex. 8 at 107-131]

<u>JURY DEMAND</u>

399. The Plaintiff's / Representative's demand a jury trial.

<u>CLAIMS FOR RELIEF</u>

400. The Plaintiff's / Representative's hereby incorporate all of the foregoing herein and hereafter.

401. The action's of Defendant's Parker and Dodson as described herein were performed under color of state law, or the lack thereof of action was performed under same.

402. The Defendant's have a lawful duty to provide a healthy and safe environment for inmates in their charge to serve their term of incarceration.

42

403. The Defendant's have a duty to ensure that Tennessee prison's do not impose and inflict cruel and unusual punishment in violation of the Eighth Amendment of the United States Constitution on the inmates in their custody, and to ensure that the policies that they create, promulgate, and enforce are in compliance with same.

404. The Defendant's are responsible for the health and well-being of the inmates in their custody, as well as their safety.

405. The Defendant's are responsible for taking reasonable measures to protect the health, safety, and well-being of the correctional officials, visitors, and volunteers who work at, and /or, frequent facilities where TDOC imates are housed and interact with inmates while on the primises thereof.

406. The Defendant's both took an oath to " fully, faithfully, impartially, and diligently perform all duties required of " them in the operation of Tennessee's prison's; and that they would "execute the laws and regulations prescribed for the government of the institution", and, that they would "on no occasion, ill treat or abuse any convict under [their] care, beyond the punishment ordered by law, or the rules and regulations of the institution." T.C.A. § 41-1-103.

407. The action's of Defendant's Parker and Dodson in creating, promulgating, and enforcing TDOC Policy 506.13, Identification of Inmates § VI (E), were done with deliberate indifference to the health and safety of the class, they create unsanitary and unsafe conditions of confinement by forcing inmates to wear the permanently attached wristbands thereby subjecting the class to an imminent danger of contracting, up to and including but not limited to, foodborne illness, other serious illnesses, bacterial infections, viral infections, fungal infections, parasitic infections, and /or any other form of communicable disease, as well as an imminent danger of, up to and including but not limited to, any kind of physical injury, being maimed, and/or electrocuted resulting in severe burns, violent muscle spasms which may break bones, and cardiac arrest, all of which may cause the unnecessary and wanton infliction of pain, suffering, and/or death contrary to the decent standards of society as established by Tennessean's, and such constitutes deliberate indifference to the health and safety of the class amounting to

43

cruel and unusual punishment in violation of the Eighth Amendment of the United States Constitution, which is applicable to Tennessee through the Fourteenth Amendment of same.

## RELIEF REQUESTED,

WHEREFORE, the Plaintiff's/Representative's respectfully request that the Court GRANT the following relief :

A. ISSUE a declaratory judgment stating that :

    1. TDOC Policy 506.13, Identification of Inmates § VI(E) is unconstitutional in violation of the Eighth Amendment of the United States Constitution.

B. ISSUE a final injunction ORDERING and ENJOINING Defendant's TDOC Commissioner Tony Parker and Assistant Commissioner of Prison's Lee Dodson to :

    1. Immediately remove — if not already ordered by a preliminary and/or prospective injunction — the identification wristbands from the wrists and/or arms of all inmates committed to the custody of the TDOC for incarceration.

    2. PERMANENTLY ENJOIN BY FINAL INJUNCTION the use of any type of identification wristband and/or bracelet that is permanently attached and non-removable from inmates' wrists and/or arms.

C. AWARD attorney's fees, and the costs and expenses to prosecute this complaint as allowed by applicable laws.

D. GRANT such other relief as it may appear that the Plaintiff's/Representatives are entitled to.

## VERIFICATION

We have read the foregoing complaint and herby verify that the matters alleged therein are true, except as to matters based on information and belief, and as to those, we believe them to be true.

44

Respectfully submitted on this 23 day of October , 2019 .

/S/ *Chris Adams*
CHRISTOPHER ADAMS
328180 BCCX
1045 HORSEHEAD RD.
PIKEVILLE, TN 37367

/S/
WARREN DAVIS
494328 BCCX
1045 HORSEHEAD RD.
PIKEVILLE, TN 37367

/S/ *Gary Seeley*
GARY SEELEY
148957 BCCX
1045 HORSEHEAD RD.
PIKEVILLE, TN 37367

/S/
ROY ROGERS
298186 BCCX
1045 HORSEHEAD RD.
PIKEVILLE, TN 37367

/S/
JOSEPH OVERMAN
440455 BCCX
1045 HORSEHEAD RD.
PIKEVILLE, TN 37367

/S/ *Ronald Hayes*
RONALD HAYES
470005 BCCX
1045 HORSEHEAD RD.
PIKEVILLE, TN 37367

/S/
CARLOS AGUILAR
551630 BCCX
1045 HORSEHEAD RD.
PIKEVILLE, TN 37367

/S/
BRUCE SMILEY
378381
1045 HORSEHEAD RD.
PIKEVILLE, TN 37367

/S/
JAMES SPANN
238562 BCCX
1045 HORSEHEAD RD.
PIKEVILLE, TN 37367

/S/
CHAD BELL
467022 BCCX
1045 HORSEHEAD RD.
PIKEVILLE, TN 37367

/S/ *John Saulsberry*
JOHN SAULSBERRY
125286 BCCX
1045 HORSEHEAD RD.
PIKEVILLE, TN 37367

/S/
RICHARD CALFEE
246178 BCCX
1045 HORSEHEAD RD.
PIKEVILLE, TN 37367

/S/
BARRY WADDELL
275036 BCCX
1045 HORSEHEAD RD.
PIKEVILLE, TN 37367

Sworn to and subscribed before me this
16th day of October , 2019 .

_____
Notary Public

My commission expires 3 / 9 / 22 .

45